IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANK JACKSON KENNEDY,<br><br>      Petitioner,<br><br>  vs.<br><br>RALPH DIAZ, Secretary, California Department of Corrections and Rehabilitation,[1]<br><br>      Respondent. | No. 2:14-cv-00510-JKS<br><br>MEMORANDUM DECISION |

  Hank Jackson Kennedy, a former state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. At the time he filed his Petition, Kennedy was in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Pleasant Valley State Prison. It appears that Kennedy has since been released on supervised parole, as a search on the Department of Corrections and Rehabilitation's inmate locator website (http://inmatelocator.cdcr.ca.gov/, Inmate No. T63928) has no record of him.[2] Respondent has answered, and Kennedy has replied.

---

  [1] Because it appears that Kennedy has been released from prison but is on post-release supervision, Ralph Diaz, Secretary, California Department of Corrections and Rehabilitation, is substituted for P.D. Brazelton, former Warden, Pleasant Valley State Prison. FED. R. CIV. P. 25(c).

  [2] Kennedy's most-recent change of address, however, lists a correctional facility post office mail box. Docket No. 35. If Kennedy has an updated address, he should promptly file a change of address with the Court.

# I. BACKGROUND/PRIOR PROCEEDINGS

On October 16, 2009, Kennedy was charged with carjacking (Count 1), assault with a firearm (Count 2), and second-degree robbery (Count 3). The information additionally alleged as to Counts 1 and 3 that Kennedy personally used a firearm, discharged a firearm, and discharged a firearm causing bodily injury and that Kennedy personally inflicted great bodily injury on the victim. It further alleged that Kennedy had suffered two prior convictions for a serious felony and had also suffered two prior strike convictions. Kennedy pled not guilty and denied the special allegations. He proceeded to a jury trial on January 20, 2010. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Kennedy and the evidence presented at trial:

> This case revolves around a brutal attack on victim Kiylund Lovelady. Lovelady and his sister, T., both know defendant Hank Kennedy, who had been married to their mother for several years.
> On the evening of May 16, 2009, T. called Lovelady and asked him to give her and her boyfriend Zack a ride home from Kelly Mohr's trailer. Mohr had previously dated T.'s other brother, but had recently started spending time with Steve Gunderson. When Lovelady arrived at the trailer, defendant and Gunderson were also there.
> [Kennedy] left and, shortly thereafter, Gunderson noticed he was missing a $500 money order.$^{FN2}$ Gunderson told everyone present that no one was leaving until his money order was found. When Gunderson accused T. of taking the money order, T. said that Mohr had taken it. Gunderson threatened T., and Lovelady defended her, repeating that Mohr had taken the money order. Gunderson and Lovelady began arguing and Lovelady told his sister to get her things together so they could leave.$^{FN3}$ Lovelady followed his sister to the back room and waited while she and Zack packed their belongings.

>> FN2. Witnesses at trial referred to a "money order" while defense counsel referred to "traveler's checks" in an in camera proceeding.

>> FN3. During this argument, Lovelady learned from Gunderson that [Kennedy] was Gunderson's uncle. Gunderson, however, testified that, although he considers [Kennedy] to be his uncle, they are not actually related.

Gunderson called [Kennedy] and told him he had gotten into a little confrontation with [Kennedy's] stepson. [Kennedy] told him not to do anything to make Lovelady leave and that he would be there shortly.

A short time later, [Kennedy], Gunderson, and a third man unknown to Lovelady and T.—possibly named John—appeared in the doorway. [Kennedy] was wearing gloves and carrying a sawed-off .22 rifle with a pistol grip. [Kennedy] grabbed T. by the hair and threw her out the back door. The third man left through the back door.

[Kennedy] then told Zack to lie face down on the carpet and Zack complied. [Kennedy] pointed his gun at Lovelady, who was sitting on the bed, and demanded the money order. When Lovelady told [Kennedy] he did not have it, [Kennedy] struck him repeatedly in the head with the gun. [Kennedy] began threatening to kill Lovelady, blaming Lovelady for stealing the money order and for being involved in an alleged burglary of [Kennedy's] home on some prior date.

During the beating, Lovelady was crying and pleading to be allowed to go home. He had lain back on the bed to try to protect himself from [Kennedy's] repeated blows. He was bleeding from his head. [Kennedy] told Lovelady that he was not letting him go home. He demanded Lovelady's wallet and Lovelady told [Kennedy] his wallet was in his truck. [Kennedy] then demanded Lovelady's truck keys and cell phone. Lovelady gave [Kennedy] his truck keys, which had been in his pocket, but told [Kennedy] he did not have a cell phone. Gunderson reached down and grabbed a cell phone from in or near Lovelady's pocket.

At this point, [Kennedy] said, angrily, "You want to fucking lie to me?" and struck Lovelady even harder in the head with the gun. Dazed, Lovelady raised his leg up in an attempt to protect himself as [Kennedy] fired the gun. [Kennedy] shot him near the buttocks area. [Kennedy] told Gunderson to take Lovelady's truck and warned Lovelady not to say anything or [Kennedy] would kill Lovelady and his "whole family bloodline." [Kennedy] struck Lovelady one more time with the gun and left the room.

Lovelady was losing consciousness. Zack assisted Lovelady as they left the trailer and sought help. Lovelady was ultimately taken to the hospital where he was treated for the gunshot wound, a fractured skull, and bleeding in his brain.

After the attack, both Lovelady and T. heard of threats and were threatened or "warned" by family members, friends of family members, and individuals they believed were Sacramaniac gang members who associated with [Kennedy], not to testify. They were afraid to testify but both testified at trial.[FN4] Gunderson, who had been charged as a codefendant, pled guilty to second degree robbery during jury selection and agreed to a one-year term in county jail in exchange for his truthful testimony.

> FN4. T. testified that it was because of the threats (after the initial investigation wherein she identified defendant as having arrived with the gun) that she lied to a detective and said she did not know either man with Gunderson, lied to the defense investigator and said it was "a bunch of guys," and lied at an earlier hearing and said she did not see [Kennedy] during the incident.

3

> A friend of [Kennedy] testified that she picked [Kennedy] up on the evening of May 16 and brought him to her house. There, [Kennedy] worked on an air compressor, ate dinner, watched a movie, and fell asleep on the couch. He left between 7:00 a.m. and 9:00 a.m. the next day. She originally told the defense investigator she picked [Kennedy] up on May 17, but later changed the date.

*People v. Kennedy*, No. C064710, 2012 WL 4056241, at *1-3 (Cal. Ct. App. Sept. 17, 2012).

At the conclusion of trial, the jury found Kennedy guilty as charged and also found true the special allegations. Kennedy waived jury trial on the prior serious felony conviction and strike allegations, and the trial court also found those to be true. The trial court subsequently sentenced Kennedy to an aggregate term of 75 years to life imprisonment plus 10 years.

Through counsel, Kennedy appealed his conviction, arguing that: 1) the trial court erred in preventing the defense from eliciting third party culpability evidence from a prosecution witness; and 2) the court erred in imposing a full, consecutive 25 years to life imprisonment term for the assault conviction. The Court of Appeal unanimously affirmed the judgment against Kennedy in a reasoned, unpublished opinion issued on September 17, 2012. *Kennedy*, 2012 WL 4056241, at *5. The California Supreme Court summarily denied review on November 20, 2012.

Kennedy then filed a *pro se* petition for habeas relief in the superior court in which he claimed that trial counsel was ineffective for failing to investigate and present exculpatory defense evidence and that the prosecutor engaged in misconduct by concealing a witness and offering false and coerced testimony. The superior court denied Kennedy's claim on the merits in a reasoned, unpublished decision issued on April 10, 2014. Kennedy then raised those claims in a habeas petition to the California Supreme Court, which was denied without comment on July 9, 2014.

4

While his habeas petition was pending in the California Supreme Court, Kennedy timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated February 12, 2014. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Kennedy raises the following claims: 1) trial counsel was ineffective for failing to investigate and present certain defense witnesses; 2) the prosecutor committed misconduct by wrongfully concealing the whereabouts of a witness who could have provided exculpatory evidence; 3) the prosecutor committed misconduct by knowingly presenting perjured and coerced testimony; and 4) the trial court erred in excluding third-party culpability evidence.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.  Ineffective Assistance of Counsel (Ground 1)

Kennedy first argues, as he did before the state courts on habeas review, that trial counsel was ineffective for failing to investigate and present the testimony of certain witnesses, including himself. According to Kennedy, trial counsel should have called multiple witnesses who could have testified that Kennedy did not shoot Lovelady.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that appellate counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the

7

> *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Kennedy must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Kennedy first claims that counsel should have called Julie Francis-Kennedy, Lovelady's mother, who could have testified that Lovelady told Francis-Kennedy that Kennedy was not involved in the crime. According to Kennedy, trial counsel had Francis-Kennedy investigated, during which time she told the investigator about her son's statement. But as the superior court reasonably concluded in rejecting this claim on habeas review, "Lovelady testified at trial and was subject to cross-examination, including as to any prior inconsistent statements . Lovelady testified in part that he was threatened by Petitioner's friends and family not to testify. Those threats are the likely explanation for any supposed recantation by Lovelady of his original accusation." Kennedy thus fails to show that trial counsel's decision to not call Francis-Kennedy was anything other than a reasonable trial tactic.

Kennedy additionally complains that counsel failed to call Twilla Chill to testify. The record in this case indicates that counsel had an investigator interview Chill at least twice. As

the superior court explained, however, "Petitioner has not shown that counsel should have called Twill as a witness. Chill's statement was that Petitioner was at her home until about 6:00p.m. on May 16,. 2009. According to trial testimony, the crimes occurred on the evening of May 16. Since Chill would not have placed Petitioner at her house after 6:00p.m., her testimony would not have provided an alibi for him."

Kennedy next contends that counsel should have called Zachary Lane and Corey Miller, who he avers were witnesses to the crimes. The superior court rejected the claims on habeas review, finding that Kennedy failed to make an offer of proof showing that either Lane or Miller would have testified that Kennedy was not at the scene of the crimes. This lack of evidentiary support is fatal to his claim on federal habeas review as well.[3] *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that state habeas petitioner carries the burden of proof).

Kennedy likewise claims that counsel should have called his co-defendant Steve Gunderson to testify. According to Kennedy, such action would have "establish[ed] that Gunderson was threatening others while using my name (ie., impersonating me) during the commission of the robberies. This evidence would have supported the defense theory of misidentification." The record reflects that Gunderson pled guilty prior to trial in exchange for his truthful testimony at trial. At trial, Gunderson testified for the prosecution and was

---

[3] In support of his claim that trial counsel should have called Miller to testify, Kennedy attached an unsigned, unsworn declaration allegedly from Miller that stated, "I know for a fact that Hank Kennedy was not one of the assailants on the night in question and I am willing to testify to this in court." Lodged Document 18 at 31. Kennedy noted that he was "unable to contact and verify Mr. Miller's statement because he's in prison somewhere and I don't have the funds to hire an investigator to track him down!" *Id.* The unsigned, unsworn declaration drafted by Miller was of insufficient evidentiary value to warrant state habeas relief, and indeed, does not warrant federal habeas relief or an evidentiary hearing on federal habeas review either.

9

thoroughly cross-examined by defense counsel. Because Gunderson testified as a witness at trial, Kennedy fails to show that counsel was ineffective for failing to call him as well. To the extent Kennedy believes counsel should have asked Gunderson whether he had impersonated Kennedy, it is far too speculative and incredible to believe that Gunderson would have implicated himself in such manner. Even if he had, it is unlikely that a jury would have found Gunderson credible given that multiple victims testified that Kennedy committed the crimes with Gunderson as an accomplice.

Finally, Kennedy faults counsel for dissuading him to testify on his own behalf. A tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). On the other hand, "it cannot be permissible trial strategy, regardless of the merits or otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice," *United States v. Mullins*, 315 F.3d 449, 453 (9th Cir. 2002), because "a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense," *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). A defendant may, however, waive this right, either explicitly or implicitly. *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999). Such a waiver may be inferred from a defendant's failure to testify at trial or to notify the trial court of his desire to testify. *See id.* at 1094-1095. "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify," unless he "reject[s] his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).

Here, Kennedy has failed to demonstrate that counsel rendered prejudicially ineffective assistance by advising him to waive his right to testify on his own behalf, particularly given that, as the superior court noted, such testimony would have opened the door to Kennedy being "impeached with 'his lengthy criminal history.'" The record does not indicate that Kennedy ever expressed to the trial court that he intended or desired to testify over counsel's objections or advice. While Kennedy may now wish, with the benefit of hindsight, that he had testified at trial, the record reflects that he voluntarily waived that right. Kennedy therefore fails to demonstrate ineffective assistance of counsel with respect to any argument asserted in support of that claim.

B.  <u>Prosecutorial Misconduct</u> (Grounds 2, 3)

Kennedy additionally contends that the prosecutor committed misconduct. A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 171 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see Bonin v. Calderon*, 59 F.3d 815, 843 (9th Cir. 1995). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 485 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667 (1985)). Under this standard, a petitioner must show there is a reasonable probability the error complained of affected the outcome of the trial—*i.e.*, that absent the alleged impropriety, the verdict probably would have been different.

### i. *Brady* violation

Kennedy first argues that the prosecutor wrongfully concealed the whereabouts of Lovelady's mother, Julie Francis-Kennedy. According to Kennedy, if Francis-Kennedy were available at trial, she could have offered exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1962), and its progeny require the prosecution to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching," *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Kennedy, however, fails to demonstrate that the prosecution was in possession of and failed to disclose materially favorable information. As the superior court reasonably held when rejecting this claim on habeas review, Kennedy "has not shown either that the prosecutor was aware of exculpatory evidence and failed to disclose it, or that the prosecutor concealed Francis-Kennedy's whereabouts thus preventing [Kennedy] from calling [Francis-Kennedy] as a witness." Moreover, for the reasons discussed *supra* in rejecting Kennedy's ineffective assistance claim with respect to Francis-Kennedy's testimony, Kennedy fails to show that Francis-Kennedy had exculpatory information.

### ii. False and coerced testimony

Kennedy additionally avers that the prosecutor offered false and coerced testimony from a variety of witnesses. "[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted). The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was

material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001).

Although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Kennedy's contention that the prosecution knowingly introduced perjured testimony. Indeed, Kennedy has failed to show by way of admissible, competent evidence that any prosecution witness perjured himself or herself at trial. Again, this lack of evidentiary support is fatal to his claim. *Woodford*, 537 U.S. at 15. Petitioner's bare and conclusory allegations are manifestly insufficient to warrant habeas corpus relief. *Jones v. Gomez*, 66 F.3d 199, 204–05 & n. 1 (9th Cir. 1995); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

C.  <u>Evidentiary Error/ Exclusion of Third-Party Culpability Evidence</u> (Ground 4)

Finally, Kennedy claims that the trial court erred in excluding third-party culpability evidence. In considering this claim on direct appeal, the Court of Appeal laid out the following factual background:

> [Kennedy] sought to elicit the following third-party culpability evidence. According to [Kennedy], Gunderson was associated with a gang called the Vagos. Also according to [Kennedy], two Vagos gang members had provided Gunderson with forged traveler's checks and Gunderson was required to "kickback" 20 percent of the face value of the checks to the person who provided them. It was [Kennedy's] theory that the witnesses were all lying because they were afraid of retribution from the Vagos gang. [Kennedy] intended to attempt to elicit this testimony from Gunderson because he did not want to testify himself and be exposed to impeachment with his lengthy criminal history.<sup>FN5</sup>
>
>> FN5.  Gunderson's court-appointed attorney informed the court that, due to the potential self-inculpatory nature of the testimony regarding the fraudulent checks, Gunderson would be exercising his Fifth Amendment rights and refuse to testify on that issue in the absence of an immunity agreement. The court ultimately granted Gunderson immunity on the matter, although

> it was after the court excluded the proffered third-party culpability evidence.
>
> [Kennedy] argues there was evidence about the attack being over a missing money order and it was the Vagos gang that "would stand to lose as a result of the checks' disappearance" because they would have been owed 20 percent of the cashed checks' face value. Thus, he argues, "there was enough evidence to permit defense counsel to question Gunderson as to the source of the travelers checks, based on the defense position that members of the Vagos gang, the purported source of the checks, committed the assault when they discovered some of them were missing."

*Kennedy*, 2012 WL 4056241, at *3.

It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988). States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the trial court's denial of Kennedy's request was an abuse of discretion or unreasonable or contrary to federal law. As an initial matter, the Supreme Court has not yet "squarely addressed" whether a state court's discretionary exclusion of evidence can ever violate a defendant's right to present a defense. *See Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2008) (considering challenge to state evidentiary rule allowing discretionary exclusion of expert testimony favorable to defendant); *see also Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that no Supreme Court case has squarely addressed this issue since *Moses*). Thus, the Court of Appeal's decision could not have contravened clearly established federal law under AEDPA. *Id.*; *see Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008).

Moreover, to the extent that clearly established federal law is implicated by such a claim, federal law requires that a petitioner demonstrate that the trial court excluded "trustworthy and necessary exculpatory testimony." *Cudjo v. Ayers*, 698 F.3d 752, 754 (9th Cir. 2012) (citing *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973). A petitioner must show that the third-

15

party evidence was "inconsistent with" and "raise[d] a reasonable doubt of" his guilt. *Holmes*, 547 U.S. at 327. Kennedy fails to meet this standard as the excluded evidence "d[id] not sufficiently connect the other person to the crime" and "d[id] not tend to prove or disprove a material fact in issue at [his] trial." *Id.* As the Court of Appeal persuasively reasoned:

> [Kennedy's] argument focuses on evidence of motive. While there was some proffered evidence that Vagos gang members may have had a motive to assault the victim, evidence of mere motive or opportunity to commit the crime in another person, without more, does not suffice. There was nothing that placed these Vagos gang members at or near the trailer at the time of the assault. Indeed, defendant offers no argument to show how any direct or circumstantial evidence actually "link[ed] [these Vagos gang members] to the actual perpetration of the crime." (*People v. Hall*, *supra*, 41 Cal.3d at p. 833.) In the absence of such evidence, the proffered evidence was too remote to meet the minimum standards of relevance. (*Ibid.*)
> "A fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1018.) [Kennedy] has not shown that he had a federal constitutional right to present his third-party culpability theory in the absence of evidence beyond mere motive or opportunity. Accordingly, we conclude there was no error.

Kennedy, 2012 WL 4056241, at *3-4.

Finally, the trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury. *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence"). For the foregoing reasons, Kennedy is not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Kennedy is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 12, 2019.

                                              /s/James K. Singleton, Jr.
                                              JAMES K. SINGLETON, JR.
                                              Senior United States District Judge